UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


MONIKA SAMPER,                                                Case No.: 09-CV-1182-AC

                       Plaintiff,                      OPINION AND ORDER

      v.

PROVIDENCE ST. VINCENT MEDICAL
CENTER,

                       Defendant.

_____

ACOSTA, Magistrate Judge:

*Opinion*

       Plaintiff Monika Samper ("Samper") filed this action against Providence St. Vincent Medical

Hospital ("Hospital") alleging claims under the Americans With Disabilities Act, 42 U.S.C. § 12201

("the ADA") and ORS 659A.100 *et seq.*, for discrimination based on anxiety and sleep-related

disability.   The Hospital moves for summary judgment arguing that Samper does not have a disability under the terms of the statutes, Samper is not able to perform the essential functions of her job, the Hospital provided all of the requested accommodations, and the decision to terminate Samper was not retaliatory.   The court finds on the evidence before it that no genuine issue of material fact exists that Samper is able to perform the essential functions of her job as a neonatal nurse at the Hospital or that the Hospital provided the reasonable accommodations she requested. Accordingly, the Hospital is entitled to summary judgment.

### Preliminary Procedural Issue

The Hospital argues that Samper admitted at her deposition that she was not substantially limited by her health condition in any activity during the time she worked at the Hospital and that this admission prevents her from arguing otherwise.  Samper has offered her declaration explaining that she thought that the questions posed during her deposition related solely to limitations she experienced while she was at work and because she went to work only when her symptoms were not bad, she did not experience substantial limitations.   The Hospital counters that Samper can not create a genuine issue of material fact by submitting a declaration that conflicts with her sworn testimony.

The Supreme Court has recognized the "virtual unanimity" of circuit courts that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  In the Ninth Circuit, the general rule is that:

> a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted) (quoting *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)). *See also Noga v. Costco Wholesale Corp.*, 583 F.Supp.2d 1245, 1252 (D. Or. 2008). This rule does not extend to cases "in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Kennedy*, 952 F.2d at 267. Therefore, the district court must determine whether the contradictory testimony was given in an honest effort to clarify, or was an intentional alteration designed to create a genuine issue of material fact. *Melendez v. Morrow Cnty. Sch. Dist.*, Civ. No. 07-785-AC, 2009 WL 4015426, at *14-15 (D. Or. Nov. 19, 2009)(declaration statements did not directly contradict prior testimony and, therefore, were admissible to create a genuine issue of material fact).

The court is not convinced that Samper's affidavit contradicts her deposition testimony in any way. At her deposition, the Hospital's counsel asked Samper if she was able to perform the physical requirements of her job. Samper answered "yes" to the general question and then "yes" to the questions posed by counsel about Samper's ability to stand and walk during a typical twelve-hour shift. Counsel then immediately questioned Samper about her ability to lift, carry, push, pull, focus, concentrate, read, calculate medication dosages, communicate, run, breath, and eat. When questioned about her ability to sleep, Samper responded that she did not sleep at work and then

explained that her physical condition did limit her ability to sleep. After questioning Samper about her specific difficulties with sleeping, counsel asked Samper, "Are there any activities at all that were substantially limited by your health condition during the time you worked for Providence?" Samper answered "No." (Samper Dep. 38: 17-20.)

Counsel's questions were clearly centered on Samper's abilities to perform her work duties. He started asking specifically about Samper's ability to stand and walk during a typical work shift and then questioned Samper about her ability to engage in a number of other tasks, such as calculating medication dosages. Samper reasonably thought that counsel was questioning her about her ability to perform while on the job, a conclusion supported by the transcript and by Samper's answer that she did not sleep at work. Counsel's final question was specifically limited to Samper's limitations during the time she worked for the Hospital. While counsel may have intended to ask about Samper's physical capabilities during the period of time, in months or years, that she worked for the Hospital, Samper reasonably could have understood the question to relate solely to the time she was on the job at the Hospital. The phrase "during the time you worked for Providence" is equally susceptible to both interpretations. Accordingly, Samper's declaration in which she clarifies that she interpreted counsel's questions to relate to whether she was substantially impaired in those activities when she was working does not contradict her earlier deposition testimony.

*Background*

During all times relevant to this matter, the Hospital employed Samper as a nurse in the neonatal intensive care unit ("NICU"). (Samper Dep. 34:10-14.) The Hospital's Human Resources Policies encouraged and allowed for time-off requested and approved in advance. However, it limited unplanned, unscheduled absences to five within any twelve-month period. The policy

language specifically provided that:

> To provide quality care and service to our patients, residents, members and customers, employees are expected to be at their work area on time, for their regular work schedule. Providence recognizes however, that employees may need time away from work for a variety of personal reasons. Time off requested and approved in advance allows for replacement planning, and reduces or eliminates negative impact on productivity, co-worker or department operations.
>
> Unplanned and unreported absences, including tardiness or partial day absences, may result in disciplinary action up to and including termination. Employees are expected not to exceed five (5) occurrences of unscheduled, unapproved absences or tardy events in a rolling twelve (12) month period. Consecutive day absences for the same reason are counted as one (1) occurrence. Unplanned absences related to family medical leave, military leave, work-related illness or injury, jury duty, bereavement leave and other approved bases are not counted as occurrences under this policy. Employees are, however, expected to give notice of the need for time away whenever possible.
>
> Employees who show a pattern of absences less than this standard may be verbally counseled to avoid further occurrences and disciplinary action. Employees demonstrating a pattern of unavailability may also be counseled or disciplined. Examples include repeated absences on days preceding or following a day off, and weekend absences when scheduled to work weekends.
>
> Employees are expected to follow their department's procedures for reporting absences. Not reporting an absence may result in discipline, up to and including termination. Employees who are absent for three or more consecutive days without notifying their supervisor are considered to have voluntarily terminated their employment.

(Def.'s Ex. 201.)   The Hospital's job description for a nurse lists attendance and punctuality as an essential function of the job.  (Def.'s Ex. 202 at 2.)

Samper suffers from a condition known as fibromyalgia, which causes chronic diffuse muscle pain and tenderness with resulting fatigue and sleeplessness. (Murray Dep. 14:10-22; Samper Decl. ¶ 2.)  Those with fibromyalgia may also experience difficulties with concentration, standing, lifting and pushing.  (Samper Decl. ¶ 2.) There are no diagnostic tests or laboratory findings to support a

diagnosis of fibromyalgia.  (Murray Dep. 14:22-15:2.)  Consequently, a physician must rely on the patient's subjective reports of pain and well as indications of tenderness at an examination.  (Murray Dep. 15:3-7.)  Similarly, a physician bases his opinion on the patient's physical abilities and limitations on the patient's reports.  (Murray Dep. 60:7-20.)

Samper explained at her deposition that she did not work on days when she was feeling bad.  (Samper Dep. 86:10-16.)  Therefore, her fibromyalgia did not affect her ability to perform the requirements of her job as a neonatal nurse, such as standing or walking for three hours during a twelve-hour shift, engaging in the lifting, carrying, pushing and pulling required by the job, or focusing or concentrating while on the job.  (Samper Dep. 34:7-9, 35:13-36:24.)  Samper did indicate that she had difficulty sleeping but that this difficulty did not affect her ability to do her job once she was at work.  (Samper Dep. 37:19-38:16.)  When describing the difficulties she experienced with sleeping, Samper explained that "I would have nights where I would fall asleep for an hour, wake up for two.  Or I would toss and turn for most of the night.  Or I would have nights where I didn't even move; I slept like the dead.  It just varied."  (Samper Dep. 38:6-12.)

During her tenure with the Hospital, Samper received good reviews for her performance as a nurse but suffered from ongoing problems with absences.  In July 2000, Juanita Stram, Samper's supervisor and manger of the NICU,  indicated that Samper needed to improve her attendance and punctuality, noting that she had seven absences during the previous year.  (Def.'s Ex. 2.)  Samper knew that her attendance was an issue at this time.  (Samper Dep. 59:6-9.)  Two years later, Stram placed Samper on a performance work plan as a result of her frequent absences, which required her to limit her absences to one or two over the next sixty days.  (Def.'s Ex. 6.)  Samper indicated that the stress in her life had improved in the past few months and that she should be able to take better

care of herself which would decrease her ill time.  (Def.'s Ex. 6.)  On November 7, 2002, Stram

again placed Samper on a work plan requiring Samper to meet the Hospital's ill-call standards and

limit them to no more than one or two over the next sixty days.  (Def.'s Ex. 8.)  At this time, Samper

attributed the problems to a "chronic illness."  (Def.'s Ex. 8.)

In 2005, Samper requested intermittent medical leaves beginning on January 1, 2005.  The

Hospital denied the request because she did not qualify for leave under either the federal or state

family leave act statutes and noted that her absences would continue to count against the attendance

standard.  (Def.'s Ex. 24 at 20.)  However, in early April 2005, the Hospital granted Samper's

request for nonqualifying medical leave from March 26, 2005 to April 11, 2005, for the completion

of diagnostic tests.[1]  (Def.'s Ex.'s 20-22.)

Attendance was again an issue in Samper's performance appraisal dated July 15, 2005.

(Def.'s Ex. 24.)  Patti Wallich, who performed the appraisal, noted that Samper had exceeded the

Hospital standard of five absences per year, specifically stating that "[d]ue to personal issues,

Monika has missed a number of workdays this last year and that makes it difficult for her to have

continuity with assignments and with the teamwork of the unit."  (Def.'s Ex. 24 at 7, 19.)  Samper

explained that "due to my previously noted complex, stressful, personal life, I have needed to be

absent much more frequently than I (or the unit) would like."  (Def.'s Ex. 24 at 7.)  Samper was

placed on a work plan to bring her attendance up to Hospital standards.  (Def.'s Ex. 24 at 21.)

In August 2005, Stram arranged a meeting between herself, Samper, and Adrienne Paler, the

Hospital's leave of absence specialist, to discuss a possible solution to Samper's frequent absences

---

[1] The Hospital did not count any of Samper's leaves of absence against its attendance standard
and allowed her to return to her previous position after each leave period.  (Harrington Decl. ¶ 2.)

and her failure to qualify for leave under the federal and state family leave acts. (Def.'s Ex. 24 at 21.) Samper asked Stram to allow her to call-in to request a day off before her scheduled shift if Samper knew she was having a bad day or wouldn't be rested enough or feel well enough to work her shift and to reschedule for later in the week if she was needed. (Samper Dep. 40:18-41:16, 43:1-16; Samper Decl. ¶ 5.) Samper felt that this accommodation would allow her body to recover from the pain and fatigue she experienced due to her fibromyalgia. (Samper Decl. ¶ 5.) Stram agreed to this accommodation and Samper believes that she requested time-off under this scenario about a dozen times over the next few years. (Samper Dep. 42:13-23.) In November 2005, the Hospital granted Samper an uprotected leave of absence, from November 9 to November 18, 2005, to attend a trial involving her spouse. (Def.'s Ex.'s 26, 27.)

On July 21, 2006, Bobbi Kurronen, the new NICU manager, issued a corrective action notice to Samper based on her attendance record for the previous 12 months. (Def.'s Ex. 28.) Kurronen indicated that "[f]or this past year Monika has had 17 absences, recently was a no-show (7/12/06) and called in sick 7/18/06" which exceeded the Hospital standard of five absences per year. (Def.'s Ex. 28.) Samper felt that the seventeen reported absences was "way high" and that she had not exceeded the Hospital standard. (Samper Dep. 104:10-105:23.) After going through the Hospital's records with her union representative and finding many mistakes, Samper agreed that she had seven absences during the period, which still exceeded the Hospital's standard. (Samper Dep.106:10-24.) Nevertheless, the corrective action notice was subsequently withdrawn due to the lack of a verbal warning prior to the issuance of a written warning. (Samper Dep. 106:25-107:3, 112:25-113:6.)

About this time, Samper completed a Request for Consideration of Restrictions form indicating that she was "extremely upset that a system that was working with [Stram], is now

unacceptable with [Kurronen], and requesting an accommodation of "[a]ttendance flexibility – more ill calls than a healthy person." (Pl.'s Ex. 30.)  Samper explained that Stram had allowed her to "split shifts with people, to find my replacements if possible, to call early in the week and ask to move a shift if I knew I wasn't going to be able to work 2 in a row" and represented that "the  schedule adjustments worked well.  There were never any complaints from charge RNs.  I never heard another word from management after my last review.  I believed this was working well."  (Pl.'s Ex. 30.)

Shortly thereafter, Kurronen identified Samper's attendance as the only area needing improvement in Samper's performance appraisal for 2005-2006.  (Def.'s Ex. 32.)  Kurronen acknowledged that Samper "has some personal issues that are challenging and has made it difficult for her to be here at work" and Teresa Harrington, the associate nurse manager for the NICU and the individual who evaluated Samper, noted that:

> This is an area that Monika needs to improve upon.  She is scheduled to meet with new NICU manager R. Kurronen, ONA reps and HR to discuss this matter.  I have included an attendance policy for Monika's review and would like to see a solution to the issue.  I have recently changed Monika's schedule at her request to help facilitate a solution to her attendance issue.

(Def.'s Ex. 32 at 7, 18.)  In her comments on this issue, Samper explained that:

> At my review last year, the NICU nurse manager and I worked out a plan for my attendance issues.  She told me that if I felt I was too ill to work, that I needed to find my own replacement, split a shift, or call the change RN and see if I could move my shift to later in the week.
>
> The nurse manager shared with me that her concern was for the running of the unit.  She wanted the unit to continue to run smoothly and to not have staffing issues due to my chronic illness.  She was also concerned with meeting my health care needs.  She wanted to retain me as an employee of 10 years, and was willing to work out a solution with me.
>
> I instituted the plan that we had discussed at length.  After our final meeting in August 2005, I never heard another word about my attendance.  Neither the manager

nor any charge nurse ever told me that I was causing the unit any hardship.  I believed that the plan was working.

(Def.'s Ex. 32 at 7.)  Samper understood that the changes to her schedule were to allow her to continue to use the informal plan worked out between herself and the previous NICU manager which provided her options in the event she felt that she was too ill to work.  (Samper Dep. 114:2-9.)

In late summer of 2006, Samper made a formal written request for accommodation.  Samper requested that she not be scheduled to work more than two days a week, that those days not be scheduled back-to-back, and that she not be scheduled to work night shifts.  (Samper Dep. 39:6-40:5, Def.'s Ex. 37.)  Samper's physician, Eric L. Murray, M.D., originally included limitations related to standing, walking, and lifting that Samper requested he remove.  (Samper Dep. 116:25-117:3.)  Initially, the Hospital found that "the information supplied to establish a medical condition does not establish Monika as a qualified individual with a disability under ADA," voiced "serious concerns about [Samper's] ability to perform the essential functions of her job," and offered to explore other employment that would meet her physical restrictions.  (Pl.'s Ex. 35.)  However, Samper's requested accommodations were subsequently granted and honored by the Hospital during the remainder of Samper's employment with the Hospital.  (Samper Dep. 40:7-8, 45:16-46:6, 117:14-17.)

On December 6, 2006, Harrington issued Samper a written warning for having five occurrences of absenteeism since May 2006.  (Def.'s Ex. 38.)  Samper remembered Harrington telling her that if she called in sick one more time, she was going to get in trouble.  Samper considered this communication to be more of a threat than a warning.  (Samper Dep. 132:2-133:7.)  Samper also remembers acknowledging that the five-absence-per-year limitation had been a problem for her for some time and informally requesting that she be allowed more absences than other

employees.  (Samper Dep. 132:6-13.)

In May 2007, Samper's husband sought psychiatric counseling on her behalf after she intentionally cut her arm while in a depressed state.  (Samper Dep. 139:5-19, 141:3-15.)  At this time, Samper requested medical leave from the Hospital from May 20, 2007, to June 20, 2007, which was granted.  (Samper Dep. 141:23-142:2, 143:17-144:1; Def.'s Ex. 45.)  In her 2007 performance appraisal, Samper reported:

> [m]y attendance has improved dramatically.  This is mainly due to the fact that my chronic health issues have been under better control in the past year.  It is also due to the concessions that my managers have made in helping me determine a schedule that best[] meet[s] my medical needs (and the NICU's!!).

(Def.'s Ex. 55 at 7.)  Harrington acknowledged Samper had "made vast improvements in her attendance for this year" and explained:

> Monika has worked very hard and diligently this year with me in regards to finding a workable schedule for both the unit and herself.  The schedule that we have come up with has given Monika more opportunities this year for taking care of the complex and sicker babies and has helped Monika improve on her attendance.  This ha[s] been a win-win for both Monika and the unit.

(Def.'s Ex. 55 at 14.)

According to the Hospital's records, Samper had eight unplanned absences during the remainder of 2007 occurring on 7/18-7/21, 8/15, 8/18, 8/29, 9/29, 11/7, 11/10, 11/14, and 12/21. (Def.'s Ex. 60.)  Additionally, Samper requested, and received, medical leave from October 16, 2007, to November 4, 2007, for treatment for a staph infection, and from January 23, 2008, through February 8, 2008, for multiple migraine headaches, exacerbated by ongoing fibromylagia.  (Samper Dep. 165:12-13, 173:11-174:23; Def.'s Ex.'s 57, 61, 62, 64.)

In early 2008, just before Samper returned from medical leave, Christine Pierce, the NICU

nurse manager, advised Samper by certified letter that, after evaluating the medical needs of the NICU, the Hospital could no longer hold Samper's part-time position as a neonatal nurse and that her position would be posted and filled. (Pl.'s Ex. 67.) Pierce informed Samper that she was entitled to remain on medical leave for up to six months with appropriate physician certification and that if she did not return to work by July 23, 2008, or transfer to another position, her employment with the Hospital would end. (Pl.'s Ex. 67.)

Upon her return from her medical leave in February 2008, Samper made statements in the NICU while patients and their parents were present which she agreed were inappropriate. She commented that she had received "a certified letter trying to fire me because of my leave of absence. They can't do that, so we are suing Christine and the hospital." (Samper Dep. 184:21-18) She also stated that could not stand seeing or being near that "bitch," referring to Pierce. (Samper Dep. 185:24-186:9.)

On March 13, 2008, Harrington and Pierce issued a corrective action notice to Samper, which was intended to serve as a documented verbal warning, based on her failure to meet the Hospital's attendance standards during the previous twelve-months. The notice indicated that Samper had seven unplanned absences during that period and advised Samper that "improvement must be immediate and sustained" and that '[a]dditional unplanned absences will result in further corrective action." (Def.'s Ex. 73.) One week later, Marcia Soderling, director of perinatal services, issued a written warning to Samper, in the form of a corrective action notice, based on the disrespectful comments made, and profane language used, by Samper in early March. The warning advised Samper that her conduct was "unacceptable and must stop immediately" and that '[f]urther incidents of any such conduct will result in immediate discharge." (Def.'s Ex. 78.)

Samper was again in violation of the Hospital's attendance standard after missing work in April.  (Harrington Decl. ¶ 8.)  Hospital management scheduled a meeting with Samper to discuss her attendance and additional disciplinary steps.  (Harrington Decl. ¶ 9.)  When Samper failed to appear for the meeting, Harrington informed Samper by mail that her employment with the Hospital was terminated effective May 2, 2008, for failure to comply with the Hospital's attendance standards. (Harrington Decl. ¶ 9; Def.'s Ex. 84.)

### Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c) (2008).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id*. at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell*

*v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

### Discussion

The American with Disabilities Act of 1990 (42 U.S.C. §12201) ("the ADA") prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a)(2007). The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8)(2007); 29 C.F.R. §1630.2(m). In order to prevail on an employment discrimination claim under the ADA, a plaintiff must establish that: (1) the plaintiff is

a disabled person within the meaning of the ADA; (2) the plaintiff is able to perform the essential

functions of the job, with or without reasonable accommodation (which the plaintiff must describe);

and (3) the employer terminated the plaintiff because of the disability.  *Nunes v. Wal-Mart Stores,*

*Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).   The standard for establishing a prima facie case under

the Oregon disability statutes is the same as under the analogous ADA provision.  *See Wheeler v.*

*Marathon Printing, Inc.*, 157 Or. App. 290, 301 n.6, 974 P.2d 207 (1998) (noting that the Oregon

statutory scheme regarding workplace discrimination against disabled persons "contain[s] language

significantly similar to the ADA"); *see also* ORS 659A.139 ("O.R.S. 659A.112 to 659A.139 shall

be construed to the extent possible in a manner that is consistent with any similar provisions of the

federal Americans with Disabilities Act of 1990, as amended.").

I.  Disability

      The ADA defines disability as "(A) a physical or mental impairment that substantially limits

one or more of the major life activities of such individual; (B) a record of such an impairment; or

(C) being regarded as having such an impairment[.]"  42 U.S.C. § 12102(1) (2007). The regulations

define "substantially limited" as:

> (i) Unable to perform a major life activity that the average person in the general
> population can perform; or (ii) Significantly restricted as to the condition, manner or
> duration under which an individual can perform a particular major life activity as
> compared to the condition, manner, or duration under which the average person in
> the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  Three factors are to be considered in determining whether an individual

is substantially limited in a major life activity:  (1) the nature and severity of the impairment; (2) the

duration or expected duration of the impairment; and (3) the permanent or long-term impact, or

expected permanent or long-term impact of or resulting from the impairment.   29 C.F.R.

§1630.2(j)(2).

Here, Samper asserts that her fibromyalgia substantially limits her ability to sleep, a major life activity. Courts have recognized that a disruption in sleep may give rise to a disability protected under the ADA. *See Traxler v. Multnomah County*, Civil Case No. 06-1450-KI, 2008 WL 282272, at *10 (D. Or. Jan. 29, 2008) ("Sleeping is a major life activity."). In *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1060 (9th Cir. 2005), the Ninth Circuit held that a sleeping impairment may constitute a substantial limitation in a major life activity. The plaintiff in *Head* complained of sleeping only five or six hours a night with medication, sometimes sleeping not at all, of "passing out" immediately after returning home from work, and of suffering drowsiness throughout the day as a result of lack of sleep and medications. This was sufficient to present a genuine issue of material fact as to whether the plaintiff was disabled for purposes of the ADA. Similarly, just last year this court found that evidence establishing that plaintiff's anxiety and depression were impairments that substantially limited his ability to sleep was sufficient to raise a genuine of material on the issue of whether he was disabled under the terms of the ADA by his inability to sleep. *Melendez v. Morrow Cnty. Sch. Dist.*, 2009 WL 4015426 at *21.

Samper testified at her deposition that the fibromyalgia detrimentally affects her ability to sleep. She explained that she has nights where she sleeps for an hour and then is awake for two hours, nights where she tosses and turns and gets virtually no sleep, and nights where she sleeps like the dead. Samper's treating physician, Eric Murray, M.D., confirmed that the pain caused by the fibromyalgia could cause insomnia and significantly limit Samper's ability to sleep. Samper has presented sufficient evidence to raise a genuine issue of material fact with regard to whether she was disabled by an inability to sleep sufficient to qualify for protection under the ADA.

## II.  Qualified

The Hospital argues that because Samper was unable to adhere to the Hopital's attendance policy, she is unable to establish the second element of her *prima facie* case – that she was a qualified individual able to perform the essential functions of her position as a neonatal nurse at the Hospital.  "A 'qualified individual' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Bates v. UPS*, 511 F.3d 974, 989 (9th Cir. 2007) (citing 42 U.S.C. § 12111(8)).  The statute specifically provides that:

> For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8)(2007).  "Reasonable Accommodation" is defined to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(2007).

Employers are not required to provide accommodations that "would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A)(2007).  "Undue hardship" is defined as "an action requiring significant difficulty or expense," when considered in light of certain factors. 42 U.S.C. § 12111(10)(A)(2007).  Those factors include the nature and cost of the accommodations, the overall financial resources of the employer, the number of persons employed,

the type of operation, and the overall impact on the operation of a facility.    42 U.S.C. § 12111(10)(B)(2007).

In a case virtually identical to the one at hand, a district judge found that because an employee was "unable to perform the essential functions of his job due to his lack of regular attendance and his suggested accommodations [were] neither reasonable nor effective, he [could not] be viewed as an otherwise qualified individual with a disability under the ADA" and that summary judgment in favor of the employer was appropriate. *Amato v. St. Luke's Episcopal Hosp.*, 987 F. Supp. 523, 532 (S.D.  Tx. 1997).  The plaintiff, employed as a nursing care assistant by the defendant, suffered from retinitis pigmentosa and had a history of poor attendance throughout his employment with the defendant.  *Id*. at 526-27. After repeated warnings and disciplinary actions based on the plaintiff's continued unscheduled absences, the defendant terminated the plaintiff for excessive absenteeism.  *Id*. at 527.  The plaintiff conceded that his attendance was poor under the standards set forth in defendant's attendance policy, but explained that many of his absences were attributable to his retinitis pigmentosa in that his poor eyesight caused him to board the wrong bus on occasion and he suffered from headaches which caused him to miss work.  *Id*.  The plaintiff filed an action against the defendant for violation of the ADA and intentional infliction of emotional distress.  *Id*.

In *Amato*, the defendant distributed its attendance policies to its employees and included in the job description for the plaintiff's position that his presence at the hospital was essential for the performance of his job.  *Id*. at 530.  The district court considered this to be a clear indication that the defendant deemed regular attendance to be an essential function of the job held by the plaintiff.  This, coupled with the finding of numerous courts that "attendance at work, the most basic element of

almost all jobs, is an essential element of almost all jobs," supported the district court's finding that, "as with most jobs, regular attendance is an essential function of Amato's position with St. Luke's. *Id*. (citations omitted).

The district court then found the numerous unscheduled absences clearly established that the plaintiff was not able to perform an essential function of his job, namely regular attendance at work, without reasonable accommodation. *Id*. It then considered the plaintiff's suggested accommodations of leave flexibility and unpaid leave. The court examined the types of accommodations set forth in the ADA and determined that each of those accommodations "has as its inherent prerequisite an employee who reports for work." *Id*. at 531. The court then adopted the reasoning of the Eleventh Circuit and found the suggested accommodations were unreasonable in that "'these accommodations do not address the heart of the problem; the unpredictable nature of [plaintiff's] absences.'" *Id*. at 531 (quoting *Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir. 1994). The court explained that:

> Amato's suggested accommodations provide no remedy for the sporadic and unpredictable nature of Amato's absences. His suggestions essentially require the hospital to retain and compensate a surplus of employees on Amato's scheduled work days to be available in the event he fails to report for work. This would require substantial modification of the hospital's basic employee practice of requiring employees to follow a regular schedule of attendance. Altering an employer's general practice of requiring regular attendance would be unduly burdensome to most employers, but is especially onerous for a hospital where the predictability of a certain level of staff is essential for proper patient care. On its face, the financial burden of such an accommodation outweighs any conceivable benefits. Moreover, Amato's suggestions do not address the manner in which St. Luke's could accommodate Amato's disability at his place of employment, but rather, are merely ways in which the hospital could deal with Amato's absences from work. Thus, the suggested accommodations place an undue burden on the employer, and therefore are not required under the ADA.
>
> In short, Amato's disability affects his employment, if at all, long before he arrives at his place of employment or before he fails to arrive. Therefore, any accommodation of this disability, aside from tolerating numerous sporadic absences,

is really outside the employer's realm.  Furthermore, "[w]hile the ADA focuses on eradicating barriers, the ADA does not relieve a disabled employee or applicant from the obligation to perform the essential functions of the job.  To the contrary, the ADA is intended to enable disabled persons to compete in the work-place based on the same performance standards and requirements the employers expect of persons who are not disabled."  Yet, Amato's suggested accommodations seek to exempt him from the performance standards and attendance requirements demanded of other St. Luke's employees.  Hence, because Amato is unable to perform the essential functions of his job due to his lack of regular attendance, and his suggested accommodations are neither reasonable nor effective, he cannot be viewed as an otherwise qualified individual with a disability under the ADA.

*Id*. at 531-32 (citations omitted).

Both Amato and Samper were employed by hospitals to provide nursing care to patients in need of regular and immediate medical care. Like Amato, Samper experienced attendance problems throughout her employment with the Hospital, which were attributed to her disability, and which prevented her from meeting the Hospital's attendance standards.  As in *Amato*, the job description for Samper's position as a neonatal nurse made it clear that her presence at the Hospital was essential for the performance of her job. Samper, like Amato, requested that she be allowed greater leave flexibility than that afforded her coworkers.  Based on these undeniable factual similarities, the reasoning of the Texas district court in finding that Amato's regular attendance at work was an essential function of his job and that the requested accommodations were unduly burdensome to a hospital is equally applicable to the case at hand.

Samper argues that the "the fact that an employee's disability may cause the employee to have unpredictable absences does not necessarily render the employee unqualified to perform the essential functions", that the issue of whether regular attendance is an essential job function for a particular job is an issue that must be determined on a case-by-case basis", and that "the resolution of the issue in each case requires a fact intensive inquiry." (Pl.'s Resp. To Mot. For Summ. J. at 15.)

In support of this argument, Samper relies on three cases, *Dutton v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 859 F. Supp. 498 (D. Kan. 1994), *Humphrey v. Mem'l Hospitals Ass'n*, 239 F.3d 1128 (9th Cir. 2001), and *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29 (1st Cir. 2000).

In *Dutton*, the plaintiff was an equipment operator who suffered from migraines. *Dutton*, 859 F. Supp. at 501. He was terminated due to absenteeism based solely on unexcused absences he attributed primarily to his migraines. *Id*. The plaintiff acknowledged that he was qualified for the job only if he received reasonable accommodation in the form of an exception the defendant's leave policy. *Id*. at 506. Accordingly, the primary issue before the court was whether the plaintiff's accommodation was reasonable. The court acknowledged the existence of numerous cases holding that reasonably regular and predictable attendance is an essential part of any job, but then distinguished the cases based on both the pattern of absences and the characteristics of the job in question. *Id*. at 507-08. The court noted that there was no evidence that the leave hours used by the plaintiff exceeded the number of hours he earned for vacation and sick leave while the plaintiff's in the other cases had yearly absences of 651 hours, four weeks per year not including thirty-three days of earned vacation and sick leave, and twenty-nine unexcused absences. *Id*. at 508. The court also mentioned that the defendant had failed to establish that the nature of the plaintiff's job was such that regular and predictable attendance was critical or that the plaintiff's unscheduled absences were unduly disruptive. *Id*. Based on these factors, the court found that genuine issues of material fact existed with regard to the reasonableness of the plaintiff's proposed accommodation and the hardship it might cause. *Id*. at 509.

The plaintiff in *Humphrey* was a medical transcriber whose obsessive compulsive disorder made it difficult for her to get to work on time, if at all. *Humphrey*, 239 F.3d 1128 at 1130. Initially,

the defendant accommodated the plaintiff by providing a flexible start-time arrangement which allowed her to begin work any time within a twenty-four hour period on the days she was scheduled to work. *Id*. at 1131. The plaintiff continued to miss work and requested that the defendant accommodate her disability by allowing her to work from home. *Id*. While the defendant allowed other employees to work from home, it denied the plaintiff's request based on her recent disciplinary actions for poor attendance. *Id*. The plaintiff was fired after she was absent two more times. *Id*. While the plaintiff conceded that regular and predictable performance was an essential function of her job, the Ninth Circuit differentiated between performance and attendance noting that "although excessive or unscheduled absences may prevent an employee from performing the essential functions of his job and thereby render him not otherwise qualified for purposes of the ADA, regular and predictable attendance is not per se an essential function of all jobs." *Id*. at 1135 n.11. The court then found that the defendant's refusal to accommodate the plaintiff by allowing her to work at home, which refusal was based solely on disciplinary actions due to the her disability, was improper, and that a genuine issue of material existed with regard to whether such an accommodation would have enabled the plaintiff to perform the essential tasks of her job. *Id*. at 1137.

Finally, the First Circuit considered the ADA claim of the plaintiff, a lab and data entry assistant, who suffered from arthritis and, as a result, was unable to make it to work in a timely manner. *Ward*, 209 F.3d at 31. The plaintiff worked under a "flex-time" schedule which allowed him to arrive at work anytime between 7:00 and 9:00 a.m. and the leave for the day after working seven and a half hours. *Id*. The plaintiff regularly arrived between 9:10 and 9:35 and often as late as 10:00 a.a. or 12:00 noon. *Id*. The plaintiff requested an accommodation allowing him to arrive to work late and leave after working his shift. *Id*. at 32. The defendant denied the requested

accommodation and eventually terminated the plaintiff for excessive tardiness. *Id*. The Eleventh Circuit acknowledged that: "[a]t first glance, this seems to be an easy case – we are inclined to presume that regular and reliable attendance is an essential function of any job[.]" *Id*. at 33. It then noted that upon further review of the evidence, the issue became muddled and it concluded that "there is little evidence in the record that a regular and predictable schedule is an essential function of Ward's data entry position – an open-ended schedule – would be an undue burden on this employer." *Id*. The court further explained that "resolution of the issue in each case requires a fact-intensive inquiry to the pattern of the attendance problem and the characteristics of the job in question." *Id*. at 35. Based on the absence of evidence that the plaintiff's position required that he be present during specific hours of the day, the court held that a reasonable factfinder could determine that a regular and predictable schedule was not an essential function of the job as long as he worked seven and a half hours every day. *Id*. In doing so, the court compared the holding with that in *Laurin v. Providence Hosp*., 150 F.3d 52, 59 (1st Cir. 1998), in which it acknowledged that "a 24-hour hospital unit imposes exceptional nurse-scheduling demands upon the hospital-employer," and held that the hospital's practice of shift rotation was essential to the hospital's provision of services to its clients. *Ward*, 209 F.3d at 35.

Here, Samper regularly exceeded the number of unscheduled, unplanned absences allowed by the Hospital in a twelve-month period. Samper seemingly complains that the Hospital's attendance policy requires "attendance every day, with only five absences in a year" is unreasonable. (Pl.'s Resp. To Mot. For Summ. J. At 15.) However, the policy limits employees to "five (5) occurrences of unscheduled, unapproved absences or tardy events in a rolling twelve (12) month period." The attendance policy specifically excludes time-off requested and approved in advance,

as well "unplanned absences related to family medical leave, military leave, work-related illness or injury, jury duty, bereavement leave and other approved bases" from occurrences considered unplanned and unscheduled. Samper requested and received approval for planned absences, as well as extended leaves of absence, which were not counted against her unplanned absence limit.

Also, Samper clearly cannot perform the essential functions of her job from home. To the contrary, it is evident that Samper's attendance at work is essential to the performance of her job and she presents no evidence to show otherwise. Similarly, Samper's regular and punctual attendance at work was critical to the Hospital's provision of quality services to its patients. As noted in *Amato*, the need for regular attendance is especially important for a hospital, where the predictability of a certain level of staff is essential for proper patient care. Again, Samper presents no evidence or even argument to dispute this key point. Therefore, the court finds that the reasoning set forth by the district court in *Amato*, which is based on facts which mirror those currently before the court, is instructive and should be followed here.

The Hospital's attendance policy allows employees five unplanned absences during a twelve-month period. The job description for a nurse at the Hospital lists attendance and punctuality as an essential function. (Def.'s Ex. 202 at 2.) It is clear from the job description and the cases addressing the issue that regular attendance is an essential function of Samper's job. The record establishes that Samper was unable to successfully comply with the attendance policy of the Hospital without accommodation. In 2005, the Hospital informally accommodated Samper by allowing her find her own replacement, split a shift, or call the change RN to see if she could move my shift to later in the week to when she felt she was too ill to work. This accommodation did not work, as evidenced by the seven days of unplanned absences Samper had over the next twelve-month period. In 2006,

Samper formally requested, and the Hospital agreed, to an accommodation that Samper be scheduled two twelve-hour day shifts per week on nonconsecutive days.  With this accommodation, Samper's attendance improved for a short period of time but she soon again exceeded the allowable number of unscheduled absences per twelve-month period resulting in her termination.  Therefore, even with the accommodations provided to Samper  by the Hospital, Samper was unable to comply with the Hospital's attendance policy.  On the record evidence, reasonable minds could not differ that, with or without accommodation, Samper was not able to comply the attendance requirements of the Hospital.  Accordingly, based on the evidence before the court, the Hospital has established that Samper is unable to perform, with or without accommodations, the essential functions of her job as a neonatal nurse at the Hosptial.  The Hospital is entitled to summary judgment.

III.  Accommodations

The Hospital argues it provided Samper with all of the accommodations she requested. Samper contends it denied her the flexibility to change her shift if she was too sick to work.  The record establishes the Hospital informally accommodated Samper's request for flexibility in 2005 but that Samper continued to have problems with unscheduled absences.  The record makes clear that absence, not flexibility, was the issue for the Hospital and the expectation that Samper could not meet.

Additionally, there is no evidence the Hospital objected to Samper finding her own replacement when she was unable to work.  The Hospital's only concern was those instances in which Samper called in sick and the Hospital was obligated to find her a replacement on short notice. Thereafter, the Hospital granted Samper formal request for change in schedule, which was successful for a brief period of time.  Samper then requested she not be required to comply with the attendance

policy.  This final request, if granted, would have posed too much of a burden on the Hospital and would not have been reasonable – a justification the hospital has established and which Samper offers no evidence to refute.  *See Amato*, 987 F. Supp. at 523 ("Altering an employer's general practice of requiring regular attendance would be unduly burdensome to most employers, but is especially onerous for a hospital where the predictability of a certain level of staff is essential for proper patient care.")   Accordingly, the court finds that the record establishes that the Hospital provided Samper with all the reasonable accommodations she requested and that she was still unable to perform the essential functions of her job as a NICU nurse at the Hospital.

## IV.  Retaliation

Finally, the Hospital contends Samper is unable to present facts to support a *prima facie* case of retaliation.  Specifically, the Hospital argues Samper is unable to prove a causal link between her request for accommodation and her termination.  Samper does not address this argument in her opposition and, thus, she appears to concede that she is unable to state a claim for retaliation under the ADA.  Accordingly, summary judgment on Samper's retaliation claim is appropriate.

*Conclusion.*

The Hospital's motion (#22) for summary judgment is GRANTED.

DATED this 20th day of August, 2010.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge